UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF HEALTH AND HUMAN SERVICES; ADMINISTRATION FOR CHILDREN AND FAMILIES,<br><br>Defendants. | Civil Action No. |

## COMPLAINT FOR INJUNCTIVE RELIEF

### Preliminary Statement

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for injunctive and other appropriate relief, seeking the release of agency records related to the federal government and its grantees' policies on access to vital reproductive health care, such as abortion and contraception, for unaccompanied undocumented and refugee minors in the custody of the federal government and its grantees.

2.      Currently, there are tens of thousands of unaccompanied undocumented and refugee minors in the custody of the federal government. These young people are extremely vulnerable – many have come to the United States to flee abuse and torture; they have been separated from their families; and many have been sexually abused or assaulted either in their home countries or during their long journey to the United States. Some have also been trafficked for labor or prostitution in other countries or in the United States.

3. Because many girls are sexually assaulted during their journey to the United States, some will inevitably need and want access to emergency contraception, and possibly abortion.

4. These young people are completely dependent on the government and its grantees for day-to-day care, such as clothing, food, medical care, and shelter. Moreover, the federal government and its grantees often restrict these teens' mobility and closely monitor their activities.

5. Despite their vulnerability, dependence, isolation, and lack of language skills, some religiously affiliated grantees that care for these young women deny them access to, referrals for, and information about, reproductive health care, such as contraceptives and abortion.

6. For example, the United States Conference of Catholic Bishops ("USCCB"), one of the government grantees that provides care to these teens, recently stated that they want the right to refuse to "provide, facilitate the provision of, provide information about, or refer or arrange for items or procedures to which they have a religious or moral objection," such as abortion and contraception.

7. Refusing to provide information about, access to, and referral for reproductive health care can further traumatize these teens, many of whom have already endured physical and psychological pain and suffering. And if they are unable to obtain access to care, they may become pregnant or be forced to carry a pregnancy to term.

8. Plaintiff American Civil Liberties Union ("ACLU") has therefore sought documents to uncover the details of the policies of the government and its grantees relating to the provision of reproductive health care to these teens, as well as documents

2

pertaining to how these policies work in practice. On September 19, 2014, Plaintiff requested documents under the FOIA from Defendant Administration for Children and Families ("ACF"), a subdivision of Defendant Department of Health and Human Services ("HHS"). To date, the ACLU has received only a partial response, consisting of very few documents.

9.      Plaintiff is legally entitled to these documents, which were requested approximately six months ago. Defendants have far exceeded the statutory and regulatory time limitations to respond, and have provided only a few responsive documents.

10.     Given the vulnerability of the population and the time-sensitive nature of the health care services at issue, it is crucial that the requested documents are disclosed immediately to determine whether these teens are receiving necessary health care. Accordingly, this Court should order Defendants to provide the requested records to Plaintiff immediately.

## Jurisdiction and Venue

11.     This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 552(a)(4)(A)(vii). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706.

12.     Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B) because Plaintiff's principal place of business is in New York.

## Parties

3

13.     Plaintiff is a non-profit organization that educates the public about civil liberties and employs lawyers who provide legal representation free of charge in cases involving civil liberties. The ACLU has filed multiple FOIA requests pertaining to the government's policies. The ACLU is a nationwide, non-profit, non-partisan organization with more than 500,000 members dedicated to the constitutional principles of liberty and equality.

14.     Defendant HHS is a Department of the Executive Branch of the United States government. HHS is an agency within the meaning of 5 U.S.C. § 552(f)(1).

15.     Defendant ACF, a subdivision of HHS, is a Department of the Executive Branch of the United States government. ACF is an agency within the meaning of 5 U.S.C. § 552(f)(1).

### Unaccompanied Children Programs

16.     Defendants run two programs through the Office of Refugee Resettlement ("ORR"), a subdivision of ACF. One program is for unaccompanied, undocumented children, which is called the Division of Children's Services ("DCS"). The other program is for unaccompanied refugee children, which is called the Unaccompanied Refugee Minor ("URM") Program.

17.     ORR provides grants to several private entities to provide care and placement for children in both the DCS and the URM programs.

18.     One major grantee is USCCB. USCCB does not provide direct services; instead, it subtracts with various Catholic Charities who provide care to these children in several sites across the country, including in California, New York, Texas, Virginia, and Washington.

4

19.     Upon information and belief, ORR also provides direct grants to several Catholic Charities, including sites in Arizona, Florida, and Texas.

<u>Unaccompanied Children in the DCS Program</u>

20.     By statutory definition, unaccompanied children ("UC") are under 18 years old, have no legal immigration status, and have no parent or legal guardian in the United States.  6 U.S.C. § 279(g)(2).

21.     They have come to the United States voluntarily, often fleeing violence or abuse, including sexual abuse.  They also may have been trafficked for forced prostitution or labor in other countries, or may have endured sexual assault during their long journey to the United States.

22.     Most speak little or no English.

23.     After these young people are apprehended, they remain in federal custody in the DCS program until they are deported to their home country; reunited with family in the United States; or obtain asylum or other legal status to remain in the United States.

24.     The federal government reports that in Fiscal Year 2014, 57,496 UC were referred from the Department of Homeland Security to the DCS program.

25.     ORR is statutorily obligated to "ensur[e] that the interests of the [child] are considered in decisions and actions relating to the care and custody of an unaccompanied alien child."  *Id.* § 279(b)(1)(B).

26.     Upon information and belief, after these young people are initially apprehended, they are held in "holding tanks" or cells maintained by the Border Patrol. After several days, they are transferred to ORR, which places them in various settings.

27.     These settings vary based on how long the young person will be in the government's custody, and other factors, including, for example, whether they are a flight risk.

28.     Upon information and belief, once apprehended, these young people are wholly under the control of the federal government and its grantees. Young people who, for example, are flight risks are held in jail-like facilities with limited, if any, freedom.

29.     Upon information and belief, even young people who are not held in jail-like facilities are often heavily monitored and their mobility is restricted. For example, some facilities use security cameras in hallways, gathering areas, and outside to monitor young people. Some facilities' exterior doors require security cards to enter or exit.

30.     Upon information and belief, young people who are expected to be in the government's custody for an extended period or those who have special needs are transferred to group homes or a foster family.

31.     Although the federal government provides grants to private entities, including USCCB, to provide these young people with day-to-day physical care, at all times the federal government retains legal custody of them. *See* 6 U.S.C. § 279 (b)(1)(A).

32.     Defendants are legally obligated to ensure that programs that provide care to unaccompanied, undocumented children comply with the minimum requirements detailed in the settlement agreement reached in *Flores v. Meese*, No. CV85-4544-RJK (C.D. Cal. 1996) (hereinafter "the *Flores* agreement").

33.     Under the *Flores* agreement, all programs must "provide or arrange for" appropriate medical care and "family planning services." There are no exceptions to this requirement.

34.     Moreover, under new interim final federal regulations, federal grantees that provide care to UC will have to ensure that rape victims receive emergency contraception and access to abortion.

### Unaccompanied Refugee Children

35.     ORR also runs the URM Program.  These children are generally identified by the Department of State abroad -- in the child's home country -- and are brought to the United States because they are orphans of war or other extreme circumstances.

36.     These young people are also at high risk of exploitation and physical or sexual abuse.

37.     Minors who have been trafficked into the United States for forced prostitution or labor are also placed in the URM Program.

38.     Most of these young people speak little or no English.

39.     ORR has about 700 refugee children in its care at any one time.

40.     Refugee children are afforded the same rights as domestic foster care children. *See, e.g.*, 8 U.S.C. § 1522(d); 45 C.F.R. § 400.112.

41.     Upon information and belief, private entities that accept grants from the federal government to provide care for these young people often assume both physical and legal custody of them.  For example, some grantees, including USCCB's subgrantees, routinely petition the courts for legal custody of the refugee children in their care.

42.     Medical care for these children is paid for by either Medicaid or Refugee Medical Assistance, both of which cover contraception, abortion referrals, and abortion in cases of rape, incest, and where the woman's life is in danger.

### Grantees' Restrictions on Access to Reproductive Health Care

43.     The issue of whether UC and URM are receiving proper access to reproductive health care came into the spotlight in June 2008 when the media reported that four social workers employed by Commonwealth Catholic Charities of Virginia ("CCC") were fired after helping a 16-year-old in the DCS program obtain contraception and later an abortion.

44.     CCC's Executive Director said that it was necessary to discipline the CCC staff members involved because facilitating access to the abortion and to contraception is "contrary to basic teachings of the Catholic church."

45.     Upon information and belief, after CCC fired the four social workers, USCCB sent a letter to Catholic Charities nationwide instructing them that, as Catholic organizations, they are prohibited from providing or referring for abortion services or contraceptive materials for the young people in the care of USCCB and Catholic Charities.

46.     Furthermore, in the context of a federal contract related to the care of trafficking victims, USCCB prohibited any of its subcontractors from using federal funds to refer trafficking victims to abortion or contraception, or to pay for those services. In 2012, a federal district found that this was unconstitutional.

47.     More recently, ORR released interim final regulations to ensure that grantees providing care to UC follow standards if a UC has been the victim of sexual abuse. *See* 79 Fed. Reg. 77768 (Dec. 24, 2014).

48.     The regulations provide, *inter alia*, that federal grantees caring for UC who have experienced sexual abuse must ensure "unimpeded access to emergency medical

treatment, crisis intervention services, *emergency contraception*, and sexually transmitted infections prophylaxis." 45 C.F.R. § 411.92(c) (emphasis added).

49.     Furthermore, a federal grantee must ensure that the UC is offered a pregnancy test, and "[i]f pregnancy results from an instance of sexual abuse, care provider facility must ensure that the victim receives timely and comprehensive information about all lawful pregnancy-related medical services and timely access to all lawful pregnancy-related medical services." 45 C.F.R. § 411.93(d). Government grantees must comply with these regulations by June 24, 2015.

50.     USCCB sent a letter dated February 20, 2015, responding to the request for public comments on the regulations. USCCB said that it has a religious objection to providing referrals or otherwise facilitating access to emergency contraception and abortion.

51.     In this letter, USCCB asked ORR to "free[] existing and prospective grantees, contractors, subgrantees and subcontractors from any requirement to provide, facilitate the provision of, provide information about, or refer or arrange for items or procedures to which they have a religious or moral objection."

52.     USCCB also stated that it further objects to ORR's interim final regulations, which allow a grantee with religious objections to providing emergency contraception to notify the federal government that a teen is seeking emergency contraception, so that the federal government can instead provide the emergency contraception. In other words, USCCB objects to even *notifying* the federal government that a teen in its care who has been raped is seeking emergency contraception.

53.     USCCB said that because of its religious beliefs it cannot "help ensure access" to any medical care that is contrary to its religious beliefs, including emergency contraception for a rape victim.

54.     USCCB's position means, in practice, that teens in the care of a USCCB-funded facility will likely not be able to obtain necessary reproductive health care and critical information.

55.     In any setting where a teen cannot leave on her own accord, she will be unable to obtain an abortion or contraceptives without the grantees' assistance.

56.     Even for those teens with more mobility and access to outside services, it is unlikely that they will be able to obtain an abortion or contraceptives without the grantees' assistance. The grantees' employees are often a teen's sole lifeline to the outside world, and without the employees' assistance, the teen won't be able to access reproductive health care.

57.     Indeed, all of these children in the DCS and URM programs face barriers to obtaining services if they are not provided by the government and its grantees. For example, even if a teen can leave the shelter, she still may not be able to obtain access to abortion or contraceptives without assistance because she likely speaks little or no English; she may have no support system, other than that provided by the grantee; she may have no means of transportation to the doctor's office; and she may have little or no financial resources. She also may not even know about the availability of emergency contraception and abortion; indeed, many of these teens come from countries where abortion is illegal.

### The FOIA Request and the Agency's Response

10

58.     On September 19, 2014, Plaintiff filed a FOIA request with Defendants seeking, *inter alia*, release of all policies related to reproductive health care for unaccompanied undocumented and refugee minors; all correspondence between HHS and any government grants or subgrantees regarding a young person's request for reproductive health care; and all cooperative agreements, government grants, and notices of award relating to the care of these young people by religiously affiliated entities, including the USCCB. *See* Ex. A.

59.     On September 22, 2014, Plaintiff received an email from Defendants officially acknowledging receipt of the request and designating it Request Number 14-1825.

60.     Having received no response from Defendants, Plaintiff filed a demand letter via certified mail on November 5, 2014.  Plaintiff's demand letter requested that Defendants respond to its FOIA request by November 21, 2014.

61.     Defendants thereafter contacted Plaintiff and said that they would release responsive documents as they became available.

62.     On December 16, 2014, Plaintiff received Defendants' "First Interim Response," which contained four documents related to the Budget Information and Project Narrative portions of one grantee's application, as well as a list of residential facilities.

63.     Plaintiff has since attempted to contact Defendants multiple times to arrange further document production, including emailing Defendants on December 16, 2014, and calling Defendants on February 3, 2014.  To date, Plaintiff has received no further response.

64.     Defendants have failed to comply with the time limits imposed by the FOIA statute and Defendants' regulations.

65.     Under the FOIA statute, an agency must determine whether to comply with the request within 20 days (excluding weekends and legal holidays) after receiving it. 5 U.S.C. § 522 (a)(6)(A)(i). That time limit can be shortened to 10 days, if the requestor demonstrates a compelling need for the documents. *Id.* § 522 (a)(6)(E).

66.     Under HHS regulations, HHS is to decide whether to release records within 10 working days, and must provide the records as soon as possible after that decision. 45 C.F.R. § 5.35(b)(1).

67.     Given that HHS voluntarily shortens the deadline for responding to requests to match the statutory framework for expedited requests, Plaintiff did not ask for expedited processing here.

68.     If HHS fails to "meet the deadline[], [the requester] may proceed as if [HHS] had denied [the] request." *Id.* § 5.35(a).

69.     Plaintiff therefore has instituted this action to ask the Court to order Defendants to disclose the requested documents.

### Plaintiff's Entitlement to a Waiver of or Reduced Processing Fees

70.     Plaintiff also asked for a waiver or reduction of document search, review, and duplication fees because disclosure is "likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); 45 C.F.R. § 5.45.

71.     The records sought in the instant request will significantly contribute to the public understanding of the operations and activities of HHS and its grantees. In

addition, disclosure is not in the Plaintiff's commercial interest. Plaintiff will evaluate the disclosed documents and, depending on what is contained in the documents, may well disseminate the information to the public. If Plaintiff publicly discloses information obtained through the FOIA, it will do so at no cost to the public.

72. Plaintiff is also entitled to a waiver or reduction of fees because the Plaintiff qualifies as a "representative of the news media" and the records are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II); 45 C.F.R. § 5.45(b)(3).

73. Plaintiff is a representative of the news media for the purposes of FOIA because it is an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience.

74. Plaintiff does not seek the requested information for commercial reasons. Plaintiff summarizes, explains, and disseminates the information it gathers through FOIA requests at no cost to the public.

### Causes of Action

75. Plaintiff repeats and realleges paragraphs 1-74.

76. Defendants' failure to timely make available the records sought by Plaintiff's request violates the FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and Defendants' corresponding regulation, 45 C.F.R. § 5.35(b)(1).

77. Defendants' failure to make a reasonable effort to search for records responsive to the Plaintiff's requests violates the FOIA, 5 U.S.C. § 552(a)(3)(C), and Defendants' corresponding regulation, 45 C.F.R. § 5.24.

78.     Defendants' failure to officially grant Plaintiff's request for a waiver of fees violates the FOIA, 5 U.S.C. § 552(a)(4)(A)(iii), and Defendants' corresponding regulation, 45 C.F.R. § 5.45.

79.     Defendants' failure to officially grant Plaintiff's requests for a reduction of fees violates the FOIA, 5 U.S.C. § 552(a)(4)(A)(ii)(II), and Defendants' corresponding regulation, 45 C.F.R. § 5.45(b)(3).

### Requested Relief

WHEREFORE, Plaintiff prays that this Court:

1.  Order Defendants to immediately process all requested records;

2.  Order Defendants to conduct a thorough search for all responsive records;

3.  Order Defendants to promptly disclose the requested records in their entirety, except for the disclosure of the names or identifying information of teens who have sought reproductive health care, and make copies available to Plaintiff;

4.  Enjoin Defendants from charging Plaintiff fees for the processing of their request;

5.  Award Plaintiff its costs and reasonable attorneys' fees incurred in this action under 5 U.S.C. § 552(a)(4)(E); and

6.  Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

Brigitte Amiri (BA-8497)
Brian Hauss*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: 212-549-2633
Fax: 212-549-2652

Daniel Mach*
American Civil Liberties Union Foundation
915 15th Street, 6th Floor
Washington, DC 20005
Phone: (202) 675-2330
Fax: (202) 546-0738

*motion for *pro hac vice* to be filed

# EXHIBIT A



September 19, 2014

By Certified Mail,
Return Receipt Requested

Kimberly N. Epstein
FOIA Officer
Administration for Children and Families (ACF)
7th Floor East, Aerospace Building
370 L'Enfant Promenade, S.W.
Washington, D.C. 20447

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
WWW.ACLU.ORG

Dear Ms. Epstein:

This is a request for production of records under the Freedom of Information Act, 5 U.S.C. § 552, and the implementing regulations of the Department of Health and Human Services, 45 C.F.R. Pt. 5, on behalf of the American Civil Liberties Union ("ACLU").

Definitions

For purposes of this request, the term "materials" includes but is not limited to any and all objects, writings, drawings, graphs, charts, tables, electronic or computerized data compilations, budgets, accountings, balance sheets or other financial statements, invoices, receipts, minutes, emails, electronic or computerized documents, photographs, audiotapes, videotapes, transcripts, drafts, correspondence, notes, notes of oral communications, and non-identical copies, including but not limited to copies with notations.

For purposes of this request, the term "HHS entity" means any individual or group of individuals working for the Department of Health and Human Services ("HHS") and any sub-department, office, board, program, group, agency, bureau, administration, and/or other subdivision within HHS.

Requests

Please provide the following materials:

1.    Any and all materials relating to access to abortion or contraception, including emergency contraception, between January 1, 2009 and the

present for unaccompanied alien children ("UAC") or unaccompanied refugee children. These materials should include but are not limited to:

    a. any and all correspondence, electronic mail, notes of telephone calls from communications between or among HHS, any HHS contractor/grantee, and/or any HHS subcontractor/subgrantee about a minor's request for abortion or contraception;

    b. completed treatment authorization forms for abortion or contraception;

    c. any HHS entity's policies, procedures, manuals, guidance to contractors, communications, etc., about access to abortion or contraceptives for UAC or unaccompanied refugee children, including but not limited to formal or informal memoranda regarding access to abortion or contraceptives for UAC or unaccompanied refugee children in the custody of facilities run by HHS or any HHS contractor/grantee or subcontractor/subgrantee;

    d. any HHS entity's policies, procedures, manuals, communications, etc. regarding HHS's screening or assessment of pregnancy before deciding where to place UAC or unaccompanied refugee children;

    e. any HHS contractor/grantee or subcontractor/subgrantee policies, procedures, manuals, guidance, etc., about access to abortion or contraception for UAC or unaccompanied refugee children;

    f. complaint(s) submitted by the Inspector General.

2. The notice of award, request for proposal, application for the award, cooperative agreements, and any contracts entered into with HHS relating to the care of UAC and unaccompanied refugee children by a religiously affiliated entity, including but not limited to the United States Conference of Catholic Bishops ("USCCB") and Baptist Child and Family Services ("BCFS").

3. Subcontractor/subgrantee agreements between any HHS contractor/grantee and any subcontractor/subgrantee related to the care of UAC and unaccompanied refugee children, where either the contractor/grantee or the subcontractor/subgrantee is a religiously

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2

affiliated entity, including but not limited to USCCB and BCFS.

4.     The medical authorization form HHS gives to USCCB, BCFS, and other contractors/grantees and their subcontractors/subgrantees to provide medical treatment to unaccompanied alien minors, in its current form.

5.     Significant Incident Documentation and Reporting Manual for UAC.

6.     Medical Services Manual for UAC.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

7.     List of all entities that HHS contracts with to provide day-to-day care for UAC and unaccompanied refugee children, including short-term shelters and long-term foster care.

We request that you produce responsive materials in their entirety, including all attachments, appendices, enclosures, and/or exhibits. However, to the extent that a response to this request would require HHS to provide multiple copies of identical material, the request is limited so that only one copy of the identical material is requested. Moreover, this request does not seek any personally identifying information of UAC or unaccompanied refugee children.

In the event you determine that materials contain information that falls within the statutory exemptions to mandatory disclosure, we request that such information be reviewed for possible discretionary disclosure. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 293 (1979). We also request that, in accordance with 5 U.S.C. § 552(b), any and all reasonably segregable portions of otherwise exempt materials be produced. To the extent the request is denied, we expect to receive notice in writing, including a description of the information withheld, the reasons for denial, and any exemptions relied upon. *See* 5 C.F.R. § 5.33.

Because we ask that you respond to our request as quickly as possible, and thus do not wish to slow down the agency's response, we do not ask for a fee waiver if the fee pursuant to 5 U.S.C. § 552(a)(4)(A) and 45 C.F.R. § 5.43 associated with this request is less than $500.00.

If, however, the fee exceeds $500.00, we request that the fee be waived pursuant to 45 C.F.R. § 5.45. Under § 5.45, fees should be waived or reduced if disclosure is (1) in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and (2) not primarily in the commercial interest of the requester. 45 C.F.R. § 5.45. Disclosure in this case meets both of these tests; and a fee waiver

would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'"). Fees should thus be "limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II); 45 C.F.R. § 5.41(b).

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

The HHS regulations provide the following factors to consider in determining whether disclosure is in the public interest: (a) how the records pertain to the operations or activities of the federal government; (b) whether disclosure of the records reveals any meaningful information about government operations or activities; whether one can learn from these records anything that is not already public knowledge; (c) whether the disclosure advances the understanding of the general public as distinguished from a narrow segment of interested persons; and (d) whether the contribution to public understanding will be significant and substantially greater as a result of disclosure. 45 C.F.R. § 5.45(b).

Disclosure pursuant to this request is in the public interest. First, the records pertain directly to the operations and activities of the federal government, and the vulnerable population of unaccompanied alien and refugee children. Second, the information to be learned from the requested documents is not already public knowledge.

Third, because the ACLU qualifies as a "representative of the news media" as defined by FOIA, HHS should find that the information requested is "likely to [be] disseminated to the public." *See* 45 C.F.R. § 5.45(b)(3). The ACLU meets the definition of a representative of the news media because it is "an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience." *National Sec. Archive v. Department of Def.*, 880 F.2d 1381, 1387 (D.C. Cir. 1989). *See also* 45 C.F.R. § 5.5 (defining representative of the media as a "publisher[ ] of periodicals" that "distribute[s]" its "products to the general public" and an entity that "disseminate[s] news through other media (e.g., electronic dissemination of text)"). The ACLU regularly gathers information on issues of public significance; uses its editorial skills to turn that information into distinct publications such as reports, newsletters, right-to-know pamphlets, fact sheets, and other educational materials; and distributes those materials to the general public through various channels, such as its heavily subscribed Web site (www.aclu.org), and newsletter sent to its more than 400,000 members, as well as an electronic newsletter, which is distributed to subscribers by e-mail. The ACLU

is therefore a "news media entity." *Cf. Electronic Privacy Information Ctr. v. Department of Defense*, 241 F.Supp.2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA).

Fourth, allowing fee waivers in the public interest: Disclosure will contribute to the public good in a significant way because the requested records, which are all materials related to HHS' policies and the award and terms of contracts for funding of nongovernmental entities. "[W]hat could be more important to the public's understanding of [agency] operations" than understanding how particular contracts are awarded by that agency? *Judicial Watch*, 326 F.3d at 1313.

Finally, disclosure is not in the ACLU's commercial interest, defined as "interests relating to business, trade and profit." 45 C.F.R. 5.45(c)(1). The ACLU is a "non-profit, non-partisan, public interest organization." *See Judicial Watch*, 326 F.3d at 1310. The ACLU has no intention of applying for any of the funding mentioned in this request. Additionally, the purpose of the request is to monitor and vindicate legal rights; it is unrelated to business, trade, or profit.

Because the ACLU meets the test for a fee waiver, fees associated with responding to FOIA requests are regularly waived for the ACLU.

Disclosure of the requested documents is in the public interest and not primarily in the commercial interest of the Requester, and if the fee exceeds $500.00, it should therefore be waived. In the event that you decide not to waive the fees if over $500.00, please provide me with prior notice so that we can discuss arrangements.

We look forward to a determination on this request from you within 10 (ten) working days pursuant to 45 C.F.R. § 5.35. Thank you for your prompt attention to this request. Please call me at (212) 549-2604 if you have any questions or wish to obtain further information about the nature of the documents in which we are interested. The records should be sent to Brian Hauss, ACLU Foundation, 125 Broad Street, 18th Floor, New York, NY 10004.

Sincerely,

Brian Hauss

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION